UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-455 (RCL)** |
| **REED KNOX CHRISTENSEN** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Reed Knox Christensen to 60 months of imprisonment, at the high end of the applicable guideline range, followed by three years of supervised release, $2,000 in restitution, and a mandatory special assessment of $260.

The recommended sentence accounts for the gravity of Christensen's violent conduct, his total lack of remorse, and the urgent need to deter others from engaging in political violence.

I.      **INTRODUCTION**

The defendant, Reed Knox Christensen, an engineer from Hillsboro, Oregon, traveled to Washington D.C., and participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more

than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Christensen went to Washington D.C. to stop Congress from certifying the 2020 Electoral College Vote. Christensen believed that the only way to overturn the election result was, as he would later write, to cause "trouble." After attending the former President's rally, he joined a mob of rioters on the Lower West Plaza of the Capitol grounds and harassed police officers defending the Capitol building. Christensen tried repeatedly to remove a row of metal barriers so that he and the mob could push past the police on the other side, resulting in him being pepper sprayed by officers. After recovering from the pepper spray, Christensen charged at the officers, assaulting five of them in the course of minutes before the rioters breached the police line.

Since January 6, Christensen has demonstrated an utter lack of remorse for his conduct. In an attempt to profit from his violent criminal conduct, he self-published a book lying about his conduct and spreading misinformation about the attack on the Capitol. Christensen also ran for governor of Oregon, using the campaign to obtain free publicity and brag about his participation in the riot.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## I.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case, ECF 1-1 at 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Reed Knox Christensen's Role in the January 6, 2021 Attack on the Capitol

*Approach to and Breach of the Capitol Grounds*

The evidence at trial showed that in the aftermath of 2020 presidential election, and to support then-President Trump at the "Stop the Steal" rally, Christensen traveled to Washington, D.C. from his home in Oregon with his son.   Christensen and his son attended the rally and then marched to the Capitol. *See* Image 1.



*Image 1*

While on Capitol grounds, Christensen used his cellphone to capture video footage and photographs of himself.   Christensen knew he was trespassing, even stopping to have his picture taken next to the fence surrounding the protected area of the Capitol, next to an "AREA CLOSED"

sign. *See* Exhibit 801.1.



*Image 2: Government Trial Exhibit 801.1*

Despite knowing he was not allowed past that barrier, Christensen continued walking towards the Capitol.   At approximately 1:00 p.m., a crowd of violent rioters assembled on the Lower West Terrace, having already breached the outer perimeter of the restricted area minutes before.   United States Capitol Police ("USCP") officers, later reinforced by Metropolitan Police Department ("MPD") officers, formed a police line extending across the West Plaza.   The police line was fortified with metal bicycle-rack barriers separating the officers from the crowd of rioters. USCP officers were positioned behind the line.   As Inspector Loyd described at trial, the area became the scene of a prolonged battle.

At approximately 2:08 p.m., Christensen and his son approached the southern end of the police line. When they arrived, they saw that the rioters in this area were growing increasingly violent, hurling insults and throwing objects at the officers as they stood behind the line of bike racks.

### *Assault of USCP Officer Caroline Edwards[2]*

USCP Sgt. Caroline Edwards encountered Christensen as she stood on the police line. Describing the group of rioters which included Christensen, Sgt. Edwards testified that, "the majority of the crowd was fairly angry, amped up, ready to fight." Trial Tr. at 113-114, 09/13/2022.

At approximately 2:17 p.m., Christensen attempted to remove the barricades to get past the officers. Sgt. Edwards described Christensen's actions, "He was – he seemed to be kind of going up and down the line trying to, I would almost say like look for weaknesses. . . He was kind of holding onto bike racks, you know, every now and then he would start pushing and pulling." Trial Tr. at 119, 09/13/2022.

After the rioters made a failed attempt to remove a bike rack, Christensen positioned himself at the front of the line and grabbed hold of the bike rack with his left hand. *See* Government Trial Exhibit 502.2.



*Image 3: Still from Government Trial Exhibit 502.2 at 00:03*

At approximately 2:20 p.m., Christensen stood directly in front of Sgt. Edwards and began

---

[2] Christensen was not charged with the assault of USCP Sgt. Caroline Edwards.

forcefully pulling on the barrier in an attempt to remove it. . Sgt. Edwards told him repeatedly to "get off the bike rack" and Christensen replied, "shut up lady." Trial Tr. at 120, 09/13/2022. In a further attempt to insult and intimidate Sgt. Edwards, Christensen stated, "I called you lady, which you clearly aren't. *Id*. Christensen continued to pull on the metal bike rack, in violation of Sgt. Edwards's instructions. Christensen would later demean Sgt. Edwards and show his general disregard for her and the other female officers by referring to them as "Capitol tour guides" who wore blue bomber jackets in his book. *See* Government Trial Exhibit 1010.4.


*Image 4: Still from Government Trial Exhibit 502.2 at 00:54*

Christensen's second attempt to remove the bike rack was even more forceful, requiring Sgt. Edwards and two additional officers to join forces to pull the bike rack away from Christensen. *Id*.



*Image 5: Still from Government Trial Exhibit 502.2 at 1:02*



*Image 6: Still from Government Trial Exhibit 502.2 at 01:06*

Despite the officers' efforts, Christensen maintained his grip on the bike rack. MPD
Captain Jason Bagshaw observed the officers struggling to maintain control of the bike rack.
Seeing Christensen aggressively attempting to remove the bike rack, Captain Bagshaw warned
Christensen to let go. Trial Tr. at 151, 09/13/2022. Christensen refused to comply, and Captain
Bagshaw pepper sprayed Christensen.   Though Christensen turned away, some of the spray
landed in his eyes and on his hat. *See* Government Trial Exhibit 502.2.



*Image 7: Still from Government Trial Exhibit 502.2 at 01:09*

Despite being pepper sprayed, Christensen still refused to let go of the barrier. Tr. Transcript at 154. 09/13/2023. *See* Government Trial Exhibit 502.2.



*Image 8: Still from Government Trial Exhibit 502.2 at 01:10*

At trial, Captain Bagshaw explained why Christensen's efforts to remove the bike rack were so dangerous: "You take that away, it is much easier for people to approach the officers and push past or assault or whatever is going to take place at that point. But then also, my other concern is if someone or a group of people are successful in removing the bicycle rack, does it cause other people to start trying to join in and removing the rest of the bicycle rack or continue the assaultive behavior."  Tr. Transcript at 155, 09/13/2023.   In other words, the police line was at stake.

Christensen eventually released the bike rack, but then lunged directly at Sgt. Edwards,

leaping over the bike rack, and grabbing her jacket. Tr. Transcript at 126, 09/13/2023. MPD Officer Damian Chapman, who saw Christensen lunge towards Sgt. Edwards, pepper-sprayed Christensen in the eyes. *See* Government Trial Exhibit 502.2.



*Image 9: Still from Government Trial Exhibit 502.2 at 01:16*

Officer Chapman's concern was not just to defend Sgt. Edwards from Christensen's assault, but also maintain the police line defending the Capitol. Tr. Transcript at 27, 09/14/2023.

Christensen finally released the bike rack, retreated into the crowd, and tried to recover from the pepper spray. A nearby rioter provided Christensen with a bottle of water. *See* Government Trial Exhibit 601.2 at 0:00 to 1:03. After flushing out his eyes using the first bottle of water, Sgt. Edwards handed Christensen a second bottle of water. *Id*. at 1:20 to 1:44. Christensen poured water from this battle into his eyes and sipped from it.

### Assault of MPD Officer Damian Chapman (Count Two)

At about 2:23 p.m., Christensen saw MPD Officer Chapman attempting to keep the barrier in place after another rioter sprayed Officer Chapman with O.C. spray. Tr. Transcript at 20, 09/14/2023. Christensen grabbed Officer Chapman's arm in an effort to stop Officer Chapman from keeping the barrier in place. Tr. Transcript at 22, 09/14/2023. *See also* Government Trial

9

Exhibit 502.1.



*Image 10: Still from Government Trial Exhibit 502.1*
*at 0:00 – 0:013; Chapman's hand circled in red, Christensen's*
*hand in blue square*

In response, Officer Chapman attempted to spray Christensen with O.C. spray, but Christensen blocked the spray. Tr. Transcript at 22-23, 30, 09/14/2023. Christensen then pushed past a nearby barrier and charged at Officer Chapman. Tr. Transcript at 22, 09/14/2023. *See also* Government Trial Exhibit 502.1.



*Image 11: Still from Government Trial Exhibit 502.1 at 00:11*



*Image 12: Still from Government Trial Exhibit 502.1 at 00:11*



*Image 13: Still from Government Trial Exhibit 502.1 at 00:12*

Christensen grabbed Officer Chapman's body, forcing Officer Chapman to push Christensen away with his right hand. Tr. Transcript at 22, 09/14/2023. *See* 502.1; 0:11-13. Officer Chapman then pepper-sprayed Christensen, yet again, in an effort to stop his assault. Christensen's assault on Officer Chapman had the intended effect – it prevented Officer Chapman from keeping the barriers in place to stop the rioters from entering Capitol grounds. Tr. Transcript at 23, 09/14/2023.

### *Assault of USCP Officer Robert English (Count Three)*

Christensen's assaults were not limited to Sgt. Edwards and Officer Chapman. Immediately after assaulting Officer Chapman, Christensen turned his attention to USCP Officer

11

Robert English.

In the minutes before he was assaulted by Christensen, Officer English was also attempting to keep a bike rack in place.



*Image 14: Still from Government Trial Exhibit 502.3 at 0:00 to 0:06*

While Officer English attempted to hold the bike rack in place, he was approached from behind by Christensen, who pushed Officer English in the center of his back, in a continued effort to stop the police from maintaining their line. *See* Government Exhibit 502.3 at :11



*Image 15: Still from Government Trial Exhibit 502.3 at 0:11*



*Image 16: Still from Government Trial Exhibit 502.3 at 0:11*



*Image 17: Still from Government Trial Exhibit 502.3 at 0:11*

**Assault of USCP Officer John Ernst (Count Four)**

Immediately after assaulting Officer English, Christensen stood in a new formed "gap" where the previous line existed. Tr. Transcript at 79, 09/14/2023. *See also* Government Trial Exhibit 504.1. Christensen brought his hands up to his face in a defensive posture, and charged directly at Officer Ernst. *Id*.



*Image 18: Still from Government Trial Exhibit 504.1 at 0:00 to 0:06*



*Image 19: Still from Government Trial Exhibit 504.1 at 0:07*

Once he reached the officer, he grabbed Officer Ernst's right arm and wrestled with him.

*Id.*



*Image 20: Still from Government Trial Exhibit 504.1 at 0:09*



*Image 21: Still from Government Trial Exhibit 504.1 at 0:09*



*Image 22: Still from Government Trial Exhibit 603 at 0:03*

In response, Officer Ernst tried to push Christensen off of him in order to end the assault. Multiple officers attempted to stop Christensen's assault, one of whom pepper-sprayed Christensen.

As with his assaults of the other officers, Christensen's assault on Officer Ernst interfered with his efforts to protect the Capitol and diverted him re-establishing a police line. 9/14/23 Trial Tr. at 81.

### Assault of MPD Officer Stephen Cooke-Barnes[3]

After his assault on Officer Ernst, Christensen committed a fifth assault on MPD Officer Stephen Cooke-Barnes. Similar to his previous assaults, Officer Ernst charged directly at Officer Cooke-Barnes's chest and pushed him. *See* Government Trial Exhibit 504.1, 0:10 – 0:13).

---

[3] The Section 111 charges did not include Christensen's assault of MPD Officer Stephen Cooke-Barnes, which the government discovered after indictment.



*Image 23: Still from Government Trial Exhibit 504.1 at 0:10 to 0:13*

In order to stop Christensen from this fifth assault, officers had to spray him yet again.. After his assault on Officer Cooke-Barnes, Christensen's son pulled him away, guiding him way from the officers into the mob of rioters, and eventually away from the plaza.   Approximately 15 minutes after Christensen assaulted multiple officers, the police lost control of the line on the West Plaza, and rioters surged forward to the Lower West Terrace and toward the Capitol.   Even more violent fighting soon began.

### *Defendant's Post-January 6 Conduct*

On January 18, 2022, Christensen self-published a book which purported to describe his conduct at the Capitol on January 6.   In the book, Christensen admitted that he had grabbed and pulled on the bike rack barricades, and that his intent was to get inside the Capitol. But Christensen also lied about the events of the day and minimized his conduct, omitting any reference to his multiple assaults on police officers or to the other violence he saw rioters perpetrate against police.

Christensen has also attempted to use his participation in the riot to launch a political career.

17

As a candidate for governor of Oregon, Christensen gave numerous interviews in which he again minimized his conduct at the Capitol, and affirmatively lied by denying that he assaulted any police officers. *See* Government Trial Exhibit 701.

## II.     THE CHARGES AND TRIAL

On December 1, 2021, a federal grand jury returned a superseding indictment charging Christensen with eight counts, including, Civil Disorder, in violation of, 18 U.S.C. § 231(a)(3) (Count 1), Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count 2), Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count 3), Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count 4), Entering and Remaining in Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 5), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 6), Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count 7), and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 8). On September 16, 2023, Christensen was convicted of those offenses following a jury trial.

## III.     STATUTORY PENALTIES

Christensen now faces sentencing on those eight counts of conviction.

With respect to Counts Two through Four, prior to trial, the government and Christensen agreed that the jury should be instructed as to the elements of a felony violation of 18 U.S.C. §

111(a), and submitted jury instructions to the court reflecting that position.[4] The government's

closing argument explained how the government had proven the elements of a felony violation of

Section 111(a) beyond a reasonable doubt. Through an apparent oversight, the instructions actually

given instructed the jury only on the elements of a misdemeanor violation of 18 U.S.C. § 111,

omitting the element that the act involve either physical contact or the intent to commit another

felony (here, a violation of 18 U.S.C. § 231(a)(3), the civil disorder statute). Tr. Transcript at 112-

13, 09/15/2023.   As a result, the jury was never asked to reach a determination on the elements of

a felony violation of 18 U.S.C. § 111(a)(1). Therefore, the convictions of 18 U.S.C. § 111(a)(1)

are Class A misdemeanor violations with a statutory maximum sentence of one year each. The

government notes, however, that with respect to the application of the sentencing guidelines, the

court may rely on all relevant conduct, including even acquitted conduct. *United States v. Settles*,

530 F.3d 920, 923 (D.C. Cir. 2008). Moreover, the court retains the ability to compensate for this

error through its discretion to impose an appropriate sentence based on the § 3553(a) factors, and

to run sentences consecutively if the sentence imposed on the count carrying the highest maximum

(Count One) is less than the total punishment.   U.S.S.G. § 5G1.2(d).

Christensen is subject to a combined maximum term of imprisonment of eleven years in

custody (5 years for Count One, the violation of 18 U.S.C. § 231(a)(3), a Class D felony; one year

for each of the six Class A misdemeanors (Counts Two-Seven, the three violations of 18 U.S.C. §

111(a) and the violations of 18 U.S.C. §§ 1752(a)(1), (2), and (4)), and six months for the one

---

[4] On September 1, 2023, the government emailed Chambers revised joint proposed jury instructions. The Court acknowledged receipt of the proposed instructions. The proposed instruction for 18 U.S.C. 111(a)(1) is attached as Government's Exhibit A.

violation of 40 U.S.C. § 5104(e)(2)(F) (Count Eight), a Class B misdemeanor). Christensen is subject to a term of probation of not more than 5 years for the Class B misdemeanor pursuant to 18 U.S.C. § 3561(c); a term of supervised release of not more than 1 year for each of the six Class A misdemeanors, and term of probation of not less than 1 nor more than 5 years for the Class D felony; a maximum fine of $250,000 for the Class D felony pursuant to 18 U.S.C. § 3571(b), $100,000 for each of the six Class A misdemeanors pursuant to 18 U.S.C. § 3571(b), and $5,000 for the one Class B misdemeanors pursuant to 18 U.S.C. § 3571(b).  Finally, mandatory special assessments stotaling $260 ($100 for the Class D felony, $25 for each of the six class A misdemeanors, and $10 for the one class B misdemeanor) apply, pursuant to 18 U.S.C. § 3013.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Guidelines calculation for each count is as follows: [5]

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact with an Officer | +3 |

[5] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The draft PSR does not follow these steps. It concludes (*see* Draft PSR ¶ 67) that Counts One, Three, and Four group—a conclusion with which the government does not agree—and does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

|  |  |  |
|---|---|---|
|  | (Specific Offense Characteristic) |  |
| U.S.S.G. § 2A2.4(c) | Cross Reference to U.S.S.G. § 2A2.2 |  |
| U.S.S.G. § 2X1.1(a) | Base Offense Level for | 14 |
|  | violation of 18 U.S.C. § 231(a)(3) |  |
|  | (U.S.S.G. § 2A2.2(a)) |  |
| U.S.S.G. § 3A1.2(a),(b) | Victim was a Government Officer | +6 |
|  | **Total** | **20** |

Count Two: 18 U.S.C. § 111(a)(1)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact with an Officer | +3 |
|  | (Specific Offense Characteristic) |  |
| U.S.S.G. § 2A2.4(c) | Cross Reference to U.S.S.G. § 2A2.2 |  |
| U.S.S.G. § 2X1.1(a) | Base Offense Level for | 14 |
|  | violation of 18 U.S.C. § 231(a)(3) |  |
|  | (U.S.S.G. § 2A2.2(a)) |  |
| U.S.S.G. § 3A1.2(a),(b) | Victim was a Government Officer | +6 |
|  | **Total** | **20** |

Count Three: 18 U.S.C. § 111(a)(1)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact with an Officer | +3 |
|  | (Specific Offense Characteristic) |  |
| U.S.S.G. § 2A2.4(c) | Cross Reference to U.S.S.G. § 2A2.2 |  |
| U.S.S.G. § 2X1.1(a) | Base Offense Level for | 14 |
|  | violation of 18 U.S.C. § 231(a)(3) |  |
|  | (U.S.S.G. § 2A2.2(a)) |  |
| U.S.S.G. § 3A1.2(a),(b) | Victim was a Government Officer | +6 |
|  | **Total** | **20** |

Count Four: 18 U.S.C. § 111(a)(1)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact with an Officer | +3 |
|  | (Specific Offense Characteristic) |  |
| U.S.S.G. § 2A2.4(c) | Cross Reference to U.S.S.G. § 2A2.2 |  |
| U.S.S.G. § 2X1.1(a) | Base Offense Level for | 14 |
|  | violation of 18 U.S.C. § 231(a)(3) |  |

|  | (U.S.S.G. § 2A2.2(a)) |  |
|---|---|---|
| U.S.S.G. § 3A1.2(a),(b) | Victim was a Government Officer | +6 |
|  | **Total** | **20** |

Count Five: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Trespass occurred on restricted grounds (Specific Offense Characteristic) | +2 |
| U.S.S.G. § 2B2.3(c)(1) | Cross Reference to U.S.S.G. § 2X1.1 |  |
| U.S.S.G. § 2X1.1(a) | Base Offense Level (from Count One) | 14 |
|  | **Total** | **14** |

Count Six: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b) | Physical contact with officers grounds (Specific Offense Characteristic) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Cross Reference to U.S.S.G. § 2A2.2 |  |
| U.S.S.G. § 2X1.1(a) | Base Offense Level (from Count One) | 14 |
|  | **Total** | **14** |

Count Seven: 18 U.S.C. § 1752(a)(4)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b) | Physical contact with officers grounds (Specific Offense Characteristic) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Cross Reference to U.S.S.G. § 2A2.2 |  |
| U.S.S.G. § 2X1.1(a) | Base Offense Level (from Count One) | 14 |
| U.S.S.G. § 3A1.2(a),(b) | Victim was a Government Officer | +6 |
|  | **Total** | **20** |

The government submits that the seven counts of conviction should be placed into *five* separate groups, not three, as the PSR suggests. Group One consists of Counts One and Seven, which grouped together because they involve the same victim: the entire group of officers guarding

the Lower West Terrace doors, including Sgt. Caroline Edwards and Officer Stephen Cooke-Barnes and other officers who were obstructed by the defendant. Count One charged the defendant with interfering with "law enforcement officers," but did not specify a particular victim. Count Seven, similarly, does not specify particular victims, but charges the defendant with interfering with physical violence against "any person" in the restricted building and grounds. The victims in Count Seven are the group of officers with whom the defendant engaged in physical violence, including victim officers who are not included in other groups. Group One therefore consists of Counts One and Seven, and the highest offense level for Group One is 20.

Groups Two through Four each consist of a single count – the assaults charged in Counts Two, Three, and Four. Each of these assaults constitutes its own group because each involves a unique victim. Count Two (Group Two) involves Metropolitan Police Department Officer Damian Chapman. Count Three (Group Three) involves United States Capitol Police Officer Robert English; and Count Four (Group Four) involves United States Capitol Police Officer John Ernst. The offense level for each of Groups Two, Three and Four is 20.

Group Five consists of Counts Five and Six, which are grouped because they involve the same victim: the U.S. Congress. U.S.S.G. § 3D1.2(a) and (b). The highest offense level in Group Five is 14.

Given this grouping analysis, the draft PSR's fourth error is the calculation of the combined adjusted offense level. Because there are four groups at offense level 20 and one group at offense level 14, the multiple count adjustment results in a total of 4.5 units, not 3.0. *See* U.S.S.G. § 3D1.4(a). Taking the offense level applicable to the Group with the highest offense level (20) and

increasing that offense level by four levels results in a Combined Offense Level of 24, and a Total Adjusted Offense Level of 24.

**U.S.S.G. § 2A2.2 Applies To Christensen's Civil Disorder and Assault Charges**

The PSR correctly uses U.S.S.G. § 2A2.2 to calculate the offense level for Christensen's assaults in violation of 18 U.S.C. § 111(a). The Statutory Index ("Appendix A") to the Sentencing Guidelines identifies the applicable Guideline or Guidelines for each charged statute, and it directs sentencing courts to apply either U.S.S.G. §§ 2A2.2 or 2A2.4 for violations of 18 U.S.C. § 111(a)(1). Section 2A2.4(c) instructs that § 2A2.2 be applied "[i]f the conduct constituted aggravated assault." In that phrase, "conduct" refers to all relevant conduct, not simply the conduct underlying the crimes for which Christensen was convicted. *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997). Section 2A2.2 defines "aggravated assault" as, *inter alia,* "a felonious assault that involved . . . (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1.

Here, despite the error which led to the jury not being instructed on the elements of a felony violation of § 111(a), evidence exists beyond a preponderance of the evidence that Christensen's assaults, including all relevant conduct, were felonious assaults.[6] The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of

---

[6] As set forth in the jury instructions which the parties agreed to, a violation of § 111 is felonious where the defendant either made physical contact with the officer victim or acted with intent to commit another felony during the commission of the assault.   *See* Government Exhibit A.

violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm."). Christensen's assaults, which all involved physical contact and the intent to commit another felony (an act of civil disorder), clearly constituted felonious assaults.

And because Christensen committed these assaults with the intent to commit another felony, namely, the felony civil disorder charged in Count One, these assaults qualify as "aggravated assaults."[7] This is just. While all those who harm officers deserve punishment, those who assaulted officers while furthering a riot deserve greater punishment.

This case is thus similar to *United States v. Clayton*, Case No. 22-cr-139 (RCL) and *United States v. Elliott*, Case No. 21-cr-735 (RCL), in which, consistent with the parties' plea agreements, this court applied U.S.S.G. § 2A2.2 to calculate the base offense level for assaults in violation of § 111(a). In an analogous situation in *United States v. Creek*, Case No. 21-cr-645 (DLF), Judge Friedrich also applied U.S.S.G. § 2A2.2 to calculate the base offense level for a violation of § 111(a)(1) on the theory that Creek's assaults against two retreating police officers were intended to further a civil disorder, in violation of 18 U.S.C. § 231(a)(3).

The same analysis applies to the calculation for Count One, Christensen's violation of 18

---

[7] The government submits that based on all relevant conduct, including Christensen's post-January 6 statements, the court could also conclude by a preponderance of the evidence that Christensen's assaults were committed with the intent of Obstruction of an Official Proceeding, in violation 18 U.S.C. § 1512(c)(2).

U.S.C. § 231. Because there is no applicable Chapter Two Guideline in the Appendix for a violation of § 231, the court is to use "the most analogous guideline." U.S.S.G. §2X5.1. Christensen's violation of § 231 embodied all of his conduct at the West Front, including his multiple aggravated assaults on officers. Accordingly, the most analogous guideline for Christensen's § 231 offense is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers" and because § 2A2.4(c) instructs that § 2A2.2 be applied "[i]f the conduct constituted aggravated assault," the appropriate guideline for Count One is § 2A2.2.

### U.S.S.G. § 4C1.1 Does Not Apply

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Among these criteria is that the defendant have not engaged in violence in connection with his crime. *See* U.S.S.G. § 4C1.1(3). Section 4C1.1 does not apply in this case because as discussed above, Christensen engaged in violence. The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC), *United States v. Baquero*, 21-cr-702 (JEB), and *United States v. Dillard*, 23-cr-49 (JMC).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 76. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, at 24, Christensen's Guidelines imprisonment range is 51 to 63 months of imprisonment.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Christensen's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Christensen trespassed on Capitol grounds, and while there, assaulted at least five officers who were defending the United States Capitol from a mob.   . The nature and circumstances of Christensen's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 60 months.

### B.   The History and Characteristics of the Defendant

The government notes that Christensen did not provide Probation with the necessary consent forms to verify his educational or medical records. PSR ¶ 93, 97. Unlike many defendants who appear before this Court, there is no history of trauma that he can invoke to try to explain his decision to engage in criminal conduct. His choices on January 6 were entirely his own.

The defendant claims to be a military veteran, and to have served in the U.S. Army National Guard and the U.S. Army Reserve. PSR ¶ 98. The government notes that Christensen has not provided Probation with the necessary consent forms to obtain his military records. PSR ¶ 98. While military service is commendable, on the unique facts of this case, it is a double-edged sword. As a veteran, Christensen knew better than most why his conduct on January 6 was wrong. His

repeated attacks on police officers, all in an effort to undermine the democratic process, was a betrayal of his military oath and rejection of everything he swore to protect when he joined the Army..

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Christensen's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Christensen is utterly without remorse for his crimes. After January 6, Christensen boasted about trespassing on the Capitol grounds and interfering with the officers by pulling on the metal

---

[8]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

bike racks, stating often that nothing would stop him from making his way to the Capitol.   During his presentence interview, Christensen stated, "My only regret is that I have only one life to give to my country." PSR ¶ 30.   During trial, when asked if he wanted to testify, Christensen saw it as moment of levity, quipping, "they already got my best lines in."   And his defense at trial reflected a failure to accept responsibility, as he sought to blame OC spray for his decision to charge at officer after officer.   His political campaign further shows that he believes his conduct on January 6 was worthy of commendation, when the opposite is true.

Thus it is clear from Christensen's own statements that he is not sorry for his actions and would willingly repeat his conduct the next time he disagrees with an election. Because his own sense of morals is insufficient, his sentence in this case must be sufficient to deter him from ever again engaging in political violence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[10]

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons certain aspects of the relevant sentencing considerations in this case.   Just as the Court imposed Guidelines sentences in those cases, Christensen warrants a Guidelines sentence as well.

This Court sentenced Scott Fairlamb, a New Jersey gym owner and MMA fighter, to 41 months imprisonment based on a single assault, in addition to a violation of 18 U.S.C. § 1512. Fairlamb was part of a group of rioters who broke through a police line in the Upper West Terrace area and forced their way into the Capitol. After leaving the Capitol, Fairlamb offered an officer water and told others in the crowd to leave the officers alone. However, approximately 20 minutes later, Fairlamb began harassing a line of MPD officers who were attempting to make their way through the thick crowd of rioters to join a larger group of officers, shoving and punching one in the face. Christensen, comparatively, assaulted five officers, and was charged with assaulting three of the five officers. Christensen made no effort to assist any of the officers. In a stark contrast from Fairlamb, it was an officer who gave Christensen water *after* he physically assaulted her, an act of kindness that Christensen repaid with more violence. Moreover, Fairlamb was one of the first January 6 defendants to plead guilty and take responsibility for his conduct. Christensen has never taken responsibility or expressed remorse for his actions.

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Duke Wilson received a sentence of 51 months after his guilty plea. Like Christensen, Wilson did not enter the Capitol. Wilson engaged in several acts of violence against three police officers, including punching them, attempting to take their shields, and throwing objects at them. However, unlike Christensen, Wilson took responsibility for his actions and expressed remorse for his conduct. Another contrast between Wilson and Christensen is that Wilson, unlike Christensen, did not make any post-January 6 statements. Christensen self-published a book and boasted about trespassing on grounds and attempting to remove the metal bike racks. Christensen's conduct is also more aggravated than James Elliott's, whom the Court sentenced to 37 months – a Guidelines sentence – after Elliott pled guilty to a single violation of Section 111(a).   *United States v. Elliott*, 21-cr-735 (RCL). Several obvious contrasts with Christensen exist: Elliott pled guilty and expressed remorse, rather than launch a political campaign capitalizing on his conduct; Elliott was the father of very young children and a critical source of economic support for his family; and Elliott committed a single assault.

These examples, which all involve sentences shorter than what the government recommends here, are not to suggest that the government recommendation here is of unprecedented length.   In fact, it is lower than the sentence that the Court has imposed on certain other defendants who have not accepted responsibility and have gone to trial, such as Craig Bingert (96 months) or Alan Hostetter (135 months).   This appropriately accounts for the fact that Christensen's assaults did not cause lasting injuries, he did not perjure himself at trial, come equipped to commit violence, or participate as part of a conspiracy.   And, while he intended to stop the certification proceeding that day, he was not convicted of (or charged with) obstruction.

## VI.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Christensen was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

34

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v.*

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Christensen to pay $2,000 in restitution for his convictions on Counts 1 through 8. This amount fairly reflects Christensen's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 60 months of imprisonment, $2,000 in restitution, a 3-year term of supervised release, and a mandatory special assessment of $260.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Brittany L. Reed*
BRITTANY L. REED
Assistant United States Attorney
LA Bar No. 31299
650 Poydras Street, Ste. 1600
New Orleans, LA 70130
504-680-3031
Brittany.Reed2@usdoj.gov

*/s/ Tighe Beach*
TIGHE BEACH
Assistant United States Attorney
CO Bar No. 55328
601 D Street, N.W.
Washington, D.C. 20001
240-278-4348
tighe.beach@usdoj.gov